STATE, Respondent, v. THOMPSON, Appellant

(24 N. W.2d 10.)

(File No. 8838. Opinion filed August 19, 1946.)

**Wm. Holland,** of Webster, and **E. B. Harkin,** of Aberdeen, for Appellant.

**George T. Mickelson,** Atty. Gen., **E. D. Barron,** Asst. Atty. Gen. and **Elmer Engebretson,** State's Atty., Day County, of Webster, for Respondent.

RUDOLPH, P.J. The defendant, Clifford Thompson, was convicted of first degree rape and has appealed. Certain of the facts are undisputed. The defendant is a farmer living about 1½ miles east of Webster, South Dakota. At the time of the alleged offense he was 32 years of age and

had a family of his wife and two children, aged 2 and 6. The complaining witness, Alice Kwasniewski, was 16 years of age and resided with her parents in Webster. She attended high school and took employment caring for children evenings. During the afternoon of the 12th of June, 1944, Mrs. Thompson, wife of the defendant, made arrangements with the mother of Alice that Alice go to the Thompson farm and take care of the children while the parents went to a dance at Waubay. About 9 o'clock that evening Mr. and Mrs. Thompson drove to Webster and took Alice back to the Thompson farm. The Thompsons left for the dance and Alice remained to care for the children; they returned from the dance sometime after 3 a. m. on the morning of the 13th of June. The dispute in the testimony arises at this point. The complaining witness testified that when the Thompsons returned from the dance Mrs. Thompson remained at the Thompson home and the defendant took to her home in Webster. The alleged attack, according to the complaining witness, occurred at a point between the Thompson home and Webster. About 6 o'clock a. m. the sheriff of Day County found the defendant asleep in his car at an intersection at the north city limits of Webster. The defendant and his wife gave an entirely different story regarding the trip from the Thompson home to Webster. They testified that when they returned after the dance the youngest child was awake and crying. The defendant suggested to Mrs. Thompson that she ride into Webster with him for the purpose of getting the baby to sleep, which she did. Both testified that the trip from the Thompson home to the Kwasniewski home was uneventful but that after leaving the Kwasniewski home the tire on the car became flat and that it was necessary to stop at the point where defendant's car was observed the next morning in order to repair the flat tire. Mrs. Thompson testified that she was worried about the other child who was left at the Thompson home and rather than wait for the tire to be repaired proceeded to walk a distance of approximately two miles to the Thompson home and carried the two-year old child. It had rained during the night and more than a mile of this walk was over a muddy dirt road. Defendant testified that after

fixing the flat tire he apparently flooded the carburetor and was unable to get the car started and fell asleep in the car where he remained until awakened by the sheriff at 6 o'clock in the morning.

At the trial of the action defendant was cross-examined with reference to certain testimony given by his wife at the preliminary hearing. This cross-examination is assigned as error. In this connection the facts disclose the following: Defendant was being cross-examined about the time he first learned that an accusation had been made against him and stated that it was the morning following the alleged incident when Alice's mother called his wife and in answer to the question "What was it that your wife told you that she had a talk with Mrs. Kwasniewski about?", testified: "All right, I will tell you. She told me that Mrs. Kwasniewski had talked to her and she said that Mrs. Kwasniewski told her unless you come in and pay us something we will have your husband arrested. There you are." Following this answer by the defendant he was cross-examined as follows:

"Q. Did your wife testify at the preliminary examination on the 21st of June, 1944 before Frank Gruby a justice of the peace at Webster in this case? A. I heard part of the testimony, I was taking care of the children part of the time.

Q. You say there was some testimony you didn't hear? A. Yes, I don't think I heard it all.

"Q. Isn't it a fact that your wife testified? A. Yes.

"Mr. Harkin: This is an attempt to introduce proposed declaration or declarations of a third party made not in the presence of this witness. It is immaterial, the question is inadmissible and should be taken up in the absence of the jury.

"The Court: You may proceed, Mr. Barron, subject to Mr. Harkin's motion to strike.

"Mr. Harkin: This court is now ruling that what his wife said at a former trial is admissible?

"The Court: Yes.

"Q. Referring to the preliminary examination before Justice Gruby I will ask you if this question was asked your wife who was a witness and hearing this answer to the following question.

"Mr. Harkin: May I ask a question to lay a foundation for an objection?

"The Court: You may.

"By Mr. Harkin: Q. Were you present at any time during any of these conversations between Mrs. Kwasniewski and Mrs. Thompson? A. I was not present.

"Mr. Harkin: We now object that whether this related to Mr. Thompson or otherwise is inadmissible because not made in his presence and cannot be used in the way of an attempt to impeach this witness.

"The Court: It may be admitted.

"(Exception noted and allowed.)

"Q. This question was asked your wife and I am asking if you heard it at the preliminary examination: 'Q.. Did Mrs. Kwasniewski call you by telephone on the morning of June 13th?' Did you hear that question asked by your wife? A. I believe I did.

"Q. And her answer was yes? A. I believe it was.

"Q. 'Q. What did she say? A. She asked me if I was coming to town that afternoon and I said "Yes, I will come in if you want me to." ' Did you hear her make that statement? A. I don't remember that.

"Q. Did you hear this question and this anwser. 'Q. What did Mrs. Kwasniewski say to you when you got to the Kwasniewski home?'

"Mr. Harkin: We desire to make an objection and desire to object to the reading of this in the presence of the jury for the reason it is simply for the purpose of making a statement and getting it before the jury. and taking chances on its being stricken out; it is immaterial and should not be had in the presence of the jury until the Court has made up his mind what the final ruling will be. Even if stricken out it is hard for the jury to sort it out. I think the Court should definitely make his ruling as to all of these statements.

"The Court: Objection overruled.

"(Exception noted and allowed.)

"Mr. Harkin: We now object to the reading of the transcript any further in the presence of the jury.

"The Court: Objection overruled. Your objection may stand to all of this.

"(Exception noted and allowed.)

"Q. Did you hear this question asked your wife at that time? 'Q. What did Mrs. Kwasniewski say to you when you got to the Kwasniewski home? A. She said, "I didn't think that of your man." ' Did you hear her make that answer to that question? A. I just couldn't say that I remember that.

"Q. 'Q. Then what did you say?' Did you hear that question asked her? A. I don't know.

"Q. Did you hear her answer 'What is the matter?' Did you hear that answer? A. Read that again.

"Q. 'Q. What is the matter?' This is the question I am asking you, I am asking you if you heard this question asked your wife. 'Q. Then what did you say?' I am asking you if you heard that question asked your wife on preliminary examination. A. I don't remember.

"Q. Did you hear her make this answer to that question. 'A. She said he had raped her daughter that night on the way to town.' Did you hear that answer? A. No, I don't remember it.

"Q. Did you hear your wife testify all through that preliminary examination? A. I was taking care of the children as I told you and I got a little of it but I didn't get it all clear and I can't say just what I heard or didn't hear.

"Q. Did you hear her tell anybody at any time during that preliminary examination that Mrs. Kwasniewski had demanded money of you?

"Mr. Harkin: That is objected to as not proper and an attempt to get in a detailed conversation indirectly which if testified to by the parties themselves or admitted they could not get in in any other manner for the reason they are not impeaching this defendant.

"The Court: Objection overruled.

"(Exception noted and allowed.)

"A. No, I didn't hear that.

"Q. You have never made that statement in court before you made it today? A. I never was asked .

"Q. You never made the statement? A. No.

"Q. You never made that claim before? A. I have never been asked that."

■■ We are of the opinion that this examination of the defendant was error. Obviously, what his wife said at the preliminary hearing was not binding upon him as to his conduct or acts on the night in question. Neither do we believe that this examination was competent to impeach the defendant. Apparently the state was seeking to impeach the statement of the defendant to the effect that his wife told him Mrs. Kwasniewski was asking for money, but we fail to see how conversation between Mrs. Thompson and Mrs. Kwasniewski as testified to by Mrs. Thompson at the preliminary hearing would serve any such purpose. Even conceding that it might be shown that Mrs. Thompson had never stated in previous hearings or trials that Mrs. Kwasniewski had demanded money, it was entirely improper to and unnecessary to ask for the details of the conversation between Mrs. Thompson and Mrs. Kwasniewski as testified to by Mrs. Thompson. This examination seems to be a deliberate attempt to get before the jury this alleged conversation not in the presence of the defendant.

Appellant further complains of the cross-examination of Mrs. Thompson. The state asked Mrs. Thompson certain questions which it contended was for the purpose of impeachment. Appellant contends that these questions called for conversations where the defendant was not present and that the testimony was incompetent as hearsay. Appellant further contends that incompetent testimony cannot be used for the purpose of impeachment. This cross-examination was followed by the complaining witness and her mother testifying that Mrs. Thompson did in substance make the statements which she denied making on the cross-examination. The record of this cross-examination is as follows: (It should be remembered that Mrs. Thompson had testified that she was with her husband on the night in question on the trip from the Thompson farm to Webster and that she left the car carrying the baby upon the occurrence of the flat tire.)

"Q. I will ask you if when you went in the house that morning of Mrs. Kwasniewski on the 13th of June, 1944 at Webster, South Dakota Mrs. Kwasniewski didn't say to you in substance or in effect 'Tracy I didn't know you had that kind of a man' and you didn't reply to her by saying 'What did he do'?

"Mr. Harkin: We object to this question as wholly immaterial, hearsay, not binding upon this defendant, no part of the res gestae, too remote from the act charged, not in any manner binding upon this defendant, not proving any fact in issue in this case.

"We further at this time object to the reading or quoting from any transcript of former testimony of some other witness, in this instance the witness Mrs. Kwasniewski, for all of the reasons urged in the objection, and for the further reason it is prejudicial to the rights of this defendant.

"The Court: Objection sustained.

"(Exception noted and allowed.)

"Mr. Barron: This is merely an impeaching question. May I present my question, I have quite a few of these; I want to lay a foundation.

"Mr. Harkin: If an offer of proof is made it should be without the presence of the jury.

"(Jury excused from courtroom.)

"After argument:

"The Court: You may proceed.

"By Mr. Barron: Q. Now Mrs. Thompson this conversation you had with Alice and Mrs. Kwasniewski that forenoon at Webster on the 13th of June, 1944 I will ask you if in that conversation you didn't make this statement in substance and to the effect to Mrs. Kawsniewski and in the presence of Alice Kwasniewski?

"Mr. Harkin: That is the same question that has been objected to. I further object to the attorney reading from a transcript for the reason it is intending to convey to the jury that such statement was contained somewhere in such transcript.

"The Court: Objection overruled.

"(Exception noted and allowed.)

"Q. (Continuing) In which conversation you were talking about your husband and Alice Kwasniewski you didn't make the following statement to Mrs. Kwasniewski and in the presence of Alice: 'He had been drinking and didn't know what he was doing. I should have brought her in myself but the roads were slippery and I was afraid to drive alone and so I asked Clifford to take her home, what can be done about it', or in substance or effect?

"Mr. Harkin: That is objected to as not proper cross-examination, not proper for any purpose, wholly immaterial, no part of the res gestae and a statement alleged to be made in the absence of the defendant which even if made would not be binding upon the defendant and could not be received by this court as an admission against the defendant for the reason there is no such agency and no such power on the part of the wife to make such statement in the absence of her husband; the further objection that if used for the purpose of impeachment it is improper impeachment.

"The Court: The objection is overruled to this extent, the answer to the question will be yes or no. The question only goes to the credibility of the witness and not to establish the conduct of the defendant, it is only touching the credibility of this witness and not any act on the part of the defendant.

"Mr. Barron: It is only offered for the purpose of impeaching this witness and constitutes no proof whatever of the conduct of the defendant.

"Mr. Holland: Then it is impeachment on an immaterial matter.

"The Court: Objection overruled.

"(Exception noted and allowed.)

"Mr. Harkin: This has taken place in the presence of the jury. Is this accepted and offered as an admission of the defendant?

"The Court: It is not received as an admission.

"Mr. Harkin: (To the witness) You are to answer this question or like questions yes or no.

"The Court: Gentlemen of the jury, the purpose of admitting this in evidence is only to determine the truth or falsity of this witness' statement.

"Q. Did or did you not make that statement or one in substance to Mrs. Kwasniewski at that time? A. No.

"Mr. Harkin: I would like the same objection unless there is some change in the questions.

"The Court: Very well.

"(Exception noted and allowed.)

"Q. I will ask you if at that same time you did not make the following statement to Mrs. Kwasniewski and Alice Kwasniewski, speaking about Alice Kwasniewski as follows: 'He said you are not mad at me are you, it wasn't my fault, he had been drinking and didn't know what he was doing, girls these days do not have to have these babies' or in words of the same substance and effect? A. No.

"Mr. Harkin: That is objected to for the further reason it is not proper impeachment for it does not go to or embody or discredit anything that this witness has testified to and therefore is not proper grounds for impeachment.

"The Court: Objection sustained.

"(Exception noted and allowed.)

"Mr. Harkin: I ask that the answer be stricken out.

"The Court: It may be stricken.

"(Exception noted and allowed.)

Q. I will ask you if at that same time and place you did not make in substance and effect this statement to Mrs. Kwasniewski: 'Please do not say any thing to any one because what would the neighbors think, if you do I will do something terrible.'

"Mr. Harkin: Objected to for the same reasons as to the last preceding question for the reason it is not even ground for any impeachment and does not in any manner contradict this witness' testimony and not binding on this defendant.

"The Court: Objection sustained.

"(Exception noted and allowed.)

"Mr. Harkin: We are objecting to the conduct of the Attorney General who is assisting the State's Attorney of Day County in proceeding to ask questions which in no manner could be construed as a foundation for impeachment merely for the purpose of making assertions to the jury which he

could not get before the jury by either calling Alice or Mrs. Kwasniewski. I think this conduct prejudicial to the rights of this defendant and the court should not allow it to continue, and I ask that the jury be admonished that the reading or quoting of these questions must not be considered by them where the court rules they are not proper.

"The Court: You may proceed.

"(Exception noted and allowed.)

"Q. I will ask you if you did not also make this statement in substance and effect at the time mentioned, namely at Webster—

"The Court: Does it have any connection with the testimony of this witness given from this witness stand?

"Mr. Barron: Yes, Your Honor.

"Q. (Continuing) at the time when you had a conversation with Mrs. Kwasniewski and Alice and in which you talked about your husband and Alice and this transaction involved if you didn't make this statement to Mrs. Kwasniewski 'Oh I should have gone with him.'

"Mr. Harkin: The same objection.

"The Court: Overruled.

"(Exception noted and allowed.)

"A. I did not."

█ It is generally held that the presence of the party whose witness it is sought to impeach when the contradictory statements were made is not necessary to make the statements admissible since the purpose of showing them is not to bind the party but to impeach the witness. 28 R. C. L. § 219, p. 633. I Wigmore on Evidence, 3d Ed., § 13, p. 300, states the rule as follows: "When an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not in admissible because it does not satisfy the rules applicable to it in some other capacity and because the jury might improperly consider it in the latter capacity. This doctrine, though involving certain risks, is indispensable as a practical rule."

██ It follows, therefore, that the cross-examination of Mrs. Thompson was proper for the purpose of impeach-

ment and it is admissible for this purpose so far as it relates to inconsistent statements of fact on material issues. It is established in this state, however, that the statement of the witness upon which he can be impeached must not only relate to the issue, but it must be a matter of fact, and not merely a former opinion of the witness in relation to the matter in issue, inconsistent with a different opinion, which might seem warranted by his testimony, or which the facts he testified to tend to establish. State v. Davidson, 9 S. D. 564, 70 N. W. 879.

■■ We are convinced that asking Mrs. Thompson whether she made such statements as the following, violates the above rule. "What can be done about it? * * * She said you are not mad at me are you, it wasn't my fault, girls these days do not have to have these babies." These statements and others in the record charged to Mrs. Thompson carried with them an opinion of Mrs. Thompson that her husband was guilty, and do not constitute a statement of any fact. See also Annotations 66 A. L. R. 294; 158 A. L. R. 820. The danger of the jury misusing evidence which is proper for impeachment and giving it weight in determining the conduct of the defendant as to which it is incompetent is manifest. This danger, together with the improper questions asked Mrs. Thompson, and the examination of the defendant above set out wherein he was questioned concerning statements made by Mrs. Thompson at the preliminary hearing created a condition at the trial which we are convinced was prejudicial to the defendant. We have set forth only a portion at the cross-examination of Thompson and his wife with reference to this conversation between Mrs. Thompson and Mrs. Kwasniewski. More than twenty pages of the transcript are consumed by the cross-examination of these witnesses with reference to this conversation and it appears, we believe, that even the questions which were competent for impeachment purposes, were converted into evidence which the jury would consider as proof of the conduct of the defendant for which purpose it was clearly incompetent.

SDC 13.2801 defines rape as follows:

"Rape is an act of sexual intercourse accomplished with

a female, not the wife of the perpetrator under either of the following circumstances:

"(1) Where the female is under the age of eighteen years;

"(2) Where she is incapable, through lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent;

"(3) Where she resists, but resistance is overcome by force or violence;

"(4) Where she is prevented from resisting by threats of immediate and great bodily harm, accompanied by apparent power of execution;

"(5) Where she is prevented from resisting by any intoxicating, narcotic or anesthetic agent administered by or with the privity of the accused;

"(6) Where she is at the time unconscious of the nature of the act and this is known to the accused;

"(7) Where she submits under a belief that the person committing the act is her husband and this belief is induced by artifice, pretence or concealment practiced by the accused with intent to induce such belief."

SDC 13.2803 provides:

"Rape committed upon a female under the age of ten years, or incapable, through lunacy or any other unsoundness of mind, of giving legal consent, or accomplished by means of force overcoming her resistance, is rape in the first degree. In all other cases rape is of the second. * * *"

It, therefore, appears that intercourse with a female under the age of ten years and intercourse under the circumstances set forth in SDC 13.2801(2) and (3) is rape of the first degree. State v. Hayes, 17 S. D. 128, 95 N. W. 296; State v. Bancroft, 23 N. D. 442, 137 N. W. 37. In the instant case only subdivision (3) of the code section is involved. The information was drawn under this section, and the court instructed the jury that "the crime of rape in the first degree, as applied to this case, is an act of sexual intercourse accomplished with a female not the wife of the perpetrator where she resists but resistance is overcome by force or violence." The court further instructed the jury as follows:

"The Court instructs the jury that at the time of the commission of the alleged offense of rape in the first degree, it was the duty of the complaining .witness, Alice Kwasniewski, to use all means within her power consistent with her strength to prevent the defendant from accomplishing his designs when said alleged rape was made upon her.

"The Court instructs the jury that it is not the law of this state that a woman assaulted with intent to commit rape upon her is required to resist by all available means within her power. The law requires only that the case be one in which the woman does not consent. Her resistance must not be mere pretense, but in good faith. The law does not require that the woman shall do more than age, strength and all the attending circumstances made it reasonable for her to do in order to manifest her opposition. The question of resistance is a question of fact for you to determine and find, and not a question that this Court can decide."

 The defendant took exception to this instruction. We believe the correct rule as to the force and resistance necessary to constitute rape in the first degree under the said subdivision (3) is stated in 52 C. J. 1019, as follows: "The female need not resist as long as either strength endures or consciousness continues. Rather the resistance must be proportioned to the outrage; and the amount of resistance required necessarily depends on the circumstances, such as the relative strength of the parties, the age and condition of the female, the uselessness of resistance, and the degree of force manifested. * * * Stated in another way, the resistance of the female to support a charge of rape need only be such as to make nonconsent and actual resistance reasonably manifest. * * * Further, the resistance must be in good faith and not a mere pretense. * * *"

 It might be that the instruction embodies the necessary elements of the force and resistance required to establish first degree rape but the language is inept. The first paragraph of the instruction advises the jury that it was the duty of the complaining witness "to use all means within her power consistent with her strength to prevent the defendant from accomplishing his designs." The first

sentence of the second paragraph told the jury that "it is not the law of this state that a woman assaulted with intent to commit rape upon her is required to resist with all available means within her power." Certainly these two statements seem inconsistent, and we are unable to determine the court's purpose in so instructing the jury. The appellant objects particularly to the sentence, "The law requires only that the case be one in which the woman does not consent." It is true that the lack of consent is the gravamen of rape, but in so far as rape in the first degree is concerned, as applied to this case, the lack of consent must be established by the resistance of the female. Simply saying that she does not consent, or lack of consent as evidenced by any of the circumstances set forth in SDC 13.2801 (1) (4) (5) (6) or (7) is not sufficient. We think the sentence to which appellant objects, appearing as it does in the instruction, could very easily be misconstrued by the jury and be misleading. The second paragraph of ths instruction was held erroneous in the case of Ma Gwire v. People, 77 Colo. 149, 235 P. 339.

Another question presented by appellant relates to the testimony of the witness T. E. Jones. On the prior trial of this case Jones had testified that he was driving through Webster on the night in question about the time defendant claimed he was in the process of repairing a tire at the intersection. Jones testified that he then saw a car parked at the intersection and a man about the size and build of the defendant walking around the car, that as he proceeded on he observed a woman carrying a child in her arms and that he did not stop to assist the woman for the reason that she had turned off the highway and had started walking up the side road. In the present trial Jones was called as a witness for the state and testified that all of the testimony given on the previous trial was false. Jones is a veterinarian and was acquainted with the defendant. He testified that shortly after this alleged crime was committed he was at defendant's place in his capacity as a veterinarian and at that time he and the defendant talked about this crime with which defendant was charged. Defendant told Jones the facts as he claimed them; he told of the flat tire and the fact that

his wife left the car and walked home along the highway. Jones testified that defendant said, in effect, that he wished he could determine who were in the cars that passed along the highway as he was fixing his tire. Jones said "Why couldn't it be me?" and defendant replied "Why not?" Jones further testified that subsequent to this conversation at the farm and shortly before the first trial of this case the defendant and his wife saw Jones in the town of Groton which was his home and asked him if he "would testify as to being one of the cars that went by." Jones also testified that during this conversation at Groton "either one of us said I could just as well be driving through there because I hadn't talked to anybody and nobody had seen me." The question presented is whether this testimony of Jones was admissible as a part of the testimony in chief of the state. The state justifies this testimony on the basis that the defendant knew that the testimony was false; that he permitted and encouraged it to be given and that such act on his part is inconsistent with his claim of innocence.

It is generally held that an attempt to fabricate evidence is receivable as evidence of one's guilt of the main facts charged. II Wigmore on Evidence, 3d Ed., § 278, p. 120, cites many cases in support of the following: "It has always been understood—the inference, indeed is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause."

From the evidence presented we believe the jury could readily find that the defendant knew that Jones was not on the road the night in question, that any testimony Jones would give to that effect would be false; the jury could further find that the defendant encouraged the giving

of such false testimony and in effect solicited it when he and his wife drove to Groton to ask Jones to testify at the trial. Should the jury so find the jury would be entitled to consider such acts on the part of defendant as an indication of his consciousness of guilt. It would not be supposed that if innocent he would permit, encourage or solicit the giving of false testimony. We think Jones' testimony was properly received. The comment of the state's attorney regarding Jones and his testimony was improper, but in view of the fact that the case must be reversed, we need not discuss this alleged error. We are satisfied that the remarks will not be repeated at another trial.

▮ Without detailing the evidence further, we simply say that we are satisfied that it is amply sufficient to sustain a conviction. Were it not for the errors above referred to we would affirm. As stated by the Minnesota court in the recent case of State v. Haney, Minn., 23 N. W.2d 369, 370 "An accused, whether guilty or innocent, is entitled to a fair trial, and it is the duty of the court, and of prosecuting counsel as well, to see that he gets one. There must be no conduct, either by argument or by the asking of irrelevant questions, the effect of which is to inflame the prejudices or excite the passions of the jury against the accused."

The judgment appealed from is reversed.

All the Judges concur.

WOHLHETER, Circuit Judge, sitting for POLLEY, J.